IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division



UNITED STATES OF AMERICA

v.

TEMITOPE AYONI OLAIYA,
a.k.a. "Tammy,"

*Defendant.*

Case No. 1:19-CR-294

Case No. 1:19-CR-323

## STATEMENT OF FACTS

The United States and the defendant, Temitope Ayoni Olaiya, agree that the following facts are true and correct, and that had this matter proceeded to trial, the United States would have proven them beyond a reasonable doubt with admissible and credible evidence:

*With respect to Count One of the Indictment*:

1. From at least in and around November 2018 through in and around June 2019, in the countries of the United States, Brazil, and elsewhere, including at Washington Dulles International Airport, in the Eastern District of Virginia and elsewhere, a conspiracy existed to import five kilograms or more of cocaine, a Schedule II controlled substance, into the United States from a place outside thereof.

2. It was part of the conspiracy that the defendant recruited men from the greater Washington DC metropolitan area to act as drug couriers; *i.e.*, to travel to foreign countries to obtain quantities of controlled substances to bring back into the United States. The defendant opened bank accounts in the couriers' names, assisted them in obtaining passports and visas, and

booked travel arrangements for them. The defendant booked travel arrangements for her couriers through Worldwide Travel, Inc., a local travel agency.

3. It was further part of the conspiracy that the defendant recruited couriers by befriending them, giving them money, buying them groceries or clothes, and paying their bills.

4. It was further part of the conspiracy that the defendant arranged for the couriers she recruited to travel to São Paulo, Brazil, where they picked up cocaine from an unindicted co-conspirator ("UCC-1"). The cocaine was typically hidden in the lining of a soft-sided briefcase or attaché case.

5. In late 2018, the defendant recruited C.L. to travel abroad to bring back contraband. The defendant provided C.L. with money to apply for a passport and visa. At the defendant's behest, C.L. traveled internationally three times: to Madagascar in December 2018, to Brazil in January 2019, and to Brazil again in February 2019. The defendant told C.L. that she would pay him $5,000 for going on these trips.

6. When C.L. returned from his second trip to Brazil, he arrived at Washington Dulles International Airport on a flight from São Paulo on February 11, 2019, in possession of approximately 2.94 kilograms of cocaine that he had obtained from UCC-1. Law enforcement seized this cocaine.

7. The defendant also recruited T.M. to travel to Brazil to bring back contraband for her. Travel invoices from Worldwide Travel show that the defendant arranged for T.M. to travel from Reagan National Airport in Arlington, Virginia, to São Paulo in December 2018. Flight records show that T.M. traveled abroad again in January 2019.

8. T.M. traveled to Brazil again in March 2019, departing from Baltimore Washington International Airport ("BWI"). When T.M. returned from this trip, he arrived at Miami

International Airport on a flight from São Paulo on March 31, 2019, in possession of approximately 2.77 kilograms of cocaine that he had obtained for the defendant from UCC-1. Law enforcement seized this cocaine.

9. The defendant attempted to recruit M.M. to travel to Brazil, although M.M. did not follow through with the plan. Flight records show that M.M. was scheduled to travel to São Paulo in February 2019 and again in April 2019. Travel invoices from Worldwide Travel (a copy of which was found in the defendant's vehicle) show that the defendant arranged for M.M. to travel from JFK International Airport in New York ("JFK") to São Paulo in April 2019.

10. The defendant also recruited A.S. to travel to Brazil to bring back contraband for her. A travel invoice found in the defendant's vehicle shows that A.S. was scheduled to travel from BWI to São Paulo in May 2019, and in fact, A.S. arrived in São Paulo on May 20. However, A.S. did not follow through with the plan; on May 28, 2019, A.S. turned himself in to the U.S. Embassy in São Paulo, Brazil.

11. The defendant also recruited R.W. to travel to Brazil on or about June 18, 2019. In advance of the trip, the defendant assisted R.W. in securing a U.S. passport, and purchased clothing items and luggage for him. The defendant instructed R.W. to receive items from UCC-1, whom the defendant also described to R.W. as her "brother." The defendant told R.W. that R.W. would receive $2,500 for going on this trip and bringing contraband back for the defendant. The defendant paid for all of R.W.'s airfare, accommodations, and expenses in São Paulo.

12. In São Paulo, R.W. met with UCC-1, as the defendant had directed. UCC-1 provided R.W. with a black briefcase to give to the defendant upon return to the United States. When R.W. returned from this trip, he arrived at JFK on a flight from São Paulo on June 23, 2019,

in possession of the approximately one kilogram of cocaine that he had obtained for the defendant from UCC-1.

13. Thereafter, law enforcement officers conducted a controlled delivery of the kilogram of cocaine seized from R.W. At approximately 12:40 a.m. on June 24, 2019, the defendant arrived at the designated meeting spot near Union Station in Washington, D.C. Shortly thereafter, the defendant took possession of the package of cocaine from R.W.

14. During the course of and in furtherance of the cocaine importation conspiracy, the defendant was personally involved in the importation of, or it was reasonably foreseeable to the defendant that her co-conspirators were involved in importing, at least five kilograms but less than 15 kilograms of cocaine.

*With respect to Count One of the Criminal Information:*

15. From in and around 2016 through 2018, the exact dates being unknown, the defendant knowingly and willfully made materially false, fictitious, and fraudulent statements and representations to the District of Columbia Department of Health Care Finance ("DHCF"), a health care benefit program as defined in Title 18, United States Code, Section 24(b), in connection with the delivery of and payment for health care benefits, items, and services.

16. The defendant worked as a personal care aide ("PCA") for various home health agencies operating in the greater Washington DC metropolitan area. These home health agencies were in the business of providing in-home health care services to Medicaid-eligible clients. In her capacity as a PCA, the defendant was responsible for personally providing in-home health services to clients who were eligible to receive such services.

17. In order to receive payment from DHCF for her work as a PCA, the defendant was required to fill out weekly timesheets documenting the time spent providing legitimate health

4

services to her clients. The defendant's clients were required to sign the timesheets to verify the services were actually rendered for the amount of time reported on the timesheet. The defendant submitted these timesheets to DHCF for reimbursement.

18. It was part of the scheme, however, that the defendant in fact submitted falsified time sheets, documenting time that she did not actually work and services that she did not actually provide. Based on these falsified timesheets, the defendant received payment from DHCF.

19. The defendant recruited Medicaid recipients to act as her "patient" and to sign her falsified timesheets. In return, she often agreed to pay these individuals a small amount of money as a kickback for signing the timesheets for her.

20. For example, the defendant recruited A.W. as a "patient" and offered to pay him $200 every two weeks to sign falsified timesheets. The defendant also asked A.W. to recruit others in his apartment building to serve as "patients." A.W. signed falsified timesheets weekly for himself, and the defendant submitted the timesheets for reimbursement. The defendant never provided any home health services for A.W.

21. The defendant also submitted falsified timesheets for another "patient," D.P. Like A.W., D.P. agreed to sign timesheets for home health services he didn't receive, and was paid money in return for signing the timesheets.

22. The defendant also submitted falsified timesheets for another "patient," K.C. The defendant provided home health services to K.C. for a time before entering into a similar monetary arrangement as the defendant had with A.W. and D.P. The defendant paid K.C. $20 per day, $80 per week, or $160 every two weeks to sign timesheets for home health services that were not provided.

23. On at least two occasions, the defendant fraudulently billed DHCF for home health services she claimed to have provided while she was out of the country. The defendant traveled to Nigeria in January 2017, and again in January 2018. She submitted, or caused to be submitted, falsified timesheets showing that she had provided home health services during both of these time periods. While the defendant was out of the country, she had another co-conspirator, M.S., obtain K.C.'s signatures on the timesheets.

24. Based upon these false and fraudulent timesheets, DHCF reimbursed the defendant for her provision of services to Medicaid recipients. In total, DHCF paid the defendant at least $85,719.66 from April 2016 through May 2018 just for claims for A.W., D.P., and K.C.

*With respect to Count Two of the Criminal Information:*

25. On or about April 3, 2017, the defendant filed articles of incorporation for a business called "Finest International Africa Market Inc." with the State of Maryland. According to this filing, the business was to engage in the importation of food products, fabrics, and clothing materials, among other things. The articles of incorporation listed the defendant as the registered agent on this filing.

26. On or about May 24, 2017, the defendant created an account under the name "African fabric" with the mobile payment processing company Square, Inc.

27. On or about June 2, 2017, Square notified the defendant that she had processed a large amount of "keyed-in" payments, meaning that the physical card was not present when the transaction occurred. Square informed the defendant at this time that such payments are often an indicator of fraudulent activity. On or about June 13, 2017, Square informed the defendant that it was deactivating her "African fabric" account, based on "a pattern of transactions associated with high-risk activity."

28. On or about June 15, 2017, the defendant created an account under the name "Fine INT AFR MRK INC" with the mobile payment processing company Stripe. The defendant's name was listed as the "company rep" on the Stripe account.

29. Between in and around June 15 and December 17, 2017, the defendant submitted, or caused to be submitted, approximately 64 separate fraudulent credit card charges, totalling $381,500, to the Stripe account. Each charge was for a round-dollar amount. Each transaction was identified as fraudulent by the issuing bank, and in at least 19 of these transactions, the issuing bank identified that the credit card was not physically present at the time of purchase. Each issuing bank was federally insured under the Federal Deposit Insurance Corporation (FDIC) or National Credit Union Administration (NCUA). The defendant sometimes used an individual, who was not aware of the defendant's fraudulent activities, to help her carry out these transactions.

30. On or about December 18, 2017, the defendant switched back to Square, creating another account under the name "Finest international Africa market inc." Between in and around December 19, 2017, and February 14, 2018, the defendant submitted, or caused to be submitted, at least 24 separate fraudulent credit card charges, totaling more than $100,000, to the new Square account. Each transaction was identified as fraudulent by the issuing bank, and each attempted transaction was done when the credit card was not physically present at the time of purchase. The following are three fraudulent transactions that the defendant made using the "Finest international Africa market inc." Square account without the cardholder's knowledge or consent.

31. For example, on or about December 22, 2017, the defendant used her new Square account, or caused the account to be used, to submit a fraudulent $7,000 charge to Visa card XXXX-XXXX-XXXX-1715, which was issued by Leesport Bank, an FDIC insured financial institution. The cardholder, J.F., did not authorize this charge. The defendant "keyed in," or

directed another individual to "key in," the credit card number to make the charge, meaning that the credit card was not physically present when the card was charged. After Square informed the defendant that the account holder, J.F., had challenged the transaction with the issuing bank and disclaimed knowledge of the charge, the defendant created, or directed another individual to create, a handwritten, falsified invoice documenting items purportedly purchased by the cardholder from the defendant. This falsified invoice was provided to Square.

32. On or about December 29, 2017, the defendant used the Square account, or caused the account to be used, to submit a fraudulent $6,500 charge to Visa card XXXX-XXXX-XXXX-9067, which was also issued by Leesport Bank. The cardholder, C.P.—who resides in Dulles, Virginia, which is in the Eastern District of Virginia—did not authorize this charge. The defendant "keyed in," or directed another individual to "key in," the credit card number to make the charge, meaning that the credit card was not physically present when the card was charged. After Square informed the defendant that the account holder, C.P., had challenged the transaction with the issuing bank and disclaimed knowledge of the charge, the defendant created, or directed another individual to create, a handwritten, falsified invoice documenting items purportedly purchased by the cardholder from the defendant. This falsified invoice was provided to Square.

33. On or about January 8, 2018, the defendant used the Square account, or caused the account to be used, to submit a fraudulent $4,000 charge to Visa card XXXX-XXXX-XXXX-9708, which was issued by Chase Bank N.A., an FDIC insured financial institution. The cardholder, J.M., did not authorize this charge. The defendant "keyed in," or directed another individual to "key in," the credit card number to make the charge, meaning that the credit card was not physically present when the card was charged. After Square informed the defendant, or someone on her behalf, that the account holder, J.M, had challenged the transaction with the

issuing bank and disclaimed knowledge of the charge, the defendant created, or directed another individual to create, a handwritten, falsified invoice documenting items purportedly purchased by the cardholder from the defendant. This falsified invoice was provided to Square.

34. This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

35. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

36. If the defendant breaches the plea agreement, then pursuant to the plea agreement, he waives any rights under Federal Rule of Criminal Procedure 11(f), Federal Rule of Evidence 410, the United States Constitution, and any federal statute or rule in objecting to the admissibility of the statement of facts in any such proceeding.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By: *Katherine Rumbaugh* (signature)
Katherine R. Rumbaugh
Assistant United States Attorney

**Defendant's signature:** After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, TEMITOPE AYONI OLAIYA, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial the United States would have proved the same beyond a reasonable doubt.

Date: 11/5/19

_____
Temitope Ayoni Olaiya
Defendant

**Defense counsel signature:** I am the defendant's attorney. I have carefully reviewed the above Statement of Facts with her. To my knowledge, her decision to stipulate to these facts is an informed and voluntary one.

Date: 11/5/19

_____
Bill R. Hicks, Esq.
Attorney for the Defendant

10